CHICAGO, R. I. & P. RY. CO. v. KETCHUM et al. (eight cases).

(District Court, S. D. Iowa, C. D. August 2, 1913.)

No. 2–A.

1. CARRIERS (§ 12*)—STATE REGULATION OF RATES—EXCURSION RATES.

Conceding the right of a state to compel railroads to grant reduced or excursion rates to persons attending the state fair, on the ground that it is an educational institution, there is no constitutional provision, national or state, which requires the extension of such rates to all passengers going to and from the city where the fair is held during its continuance, regardless of whether or not they attend it, but on the contrary such exten-·sion is not only not within the reason of the law, but operates as a clear discrimination against the industries and business interests of other cities of the state.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

2. CARRIERS (§ 12*)—CONSTITUTIONAL LAW (§§ 242, 298*)—STATE REGULATION OF RATES—LIMIT OF POWER—EXCURSION RATES.

Code Iowa, § 2077, fixes maximum passenger rates to be charged by railroads in the state according to a prescribed classification. By Acts 35th Iowa Gen. Assem. 1913, c. 165, it is provided that round trip tickets from· any point in the state to any town or city in the state where an annual fair or exposition is being held at which the attendance in the preceding year was 75,000 shall be sold by all railroads during the continuance of· such fair at prescribed rates which are materially less than those fixed by the general statute. Held, that the rates fixed by the general statute. are presumably just and reasonable, and that the Legislature, having prescribed such rates, had no power to make exceptions thereto in favor of a particular class of passengers or a particular locality; that the act was an illegal interference with the right of the railroad companies to fix their own rates of fare within the limits of the general statute and was· unconstitutional and invalid as depriving them of their property without due process of law and denying them the equal protection of the laws.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12;* Constitutional Law, Cent. Dig. §§ 691, 847; Dec. Dig. §§ 242,. 298.*]

In Equity. Suit by the Chicago, Rock Island & Pacific Railway Company against N. S. Ketchum, D. J. Palmer, and Clifford Thorne, as members of the Board of Iowa Railroad Commissioners, George Cosson, as Attorney General of Iowa, and J. H. Henderson, as Commerce Counsel for said state, with seven other cases. On motions for preliminary injunction. Motions granted.

F. W. Sargent, of Des Moines, Iowa, for complainant.

George Cosson, C. A. Robbins, J. H. Henderson, Dwight N. Lewis,. and Clifford Thorne, all of Des Moines, Iowa, for defendants.

Before SMITH, Circuit Judge,. and McPHERSON and VAN VALKENBURGH, District Judges.

SMITH, Circuit Judge. In 1874, by chapter 68 of the Acts of the Fifteenth General Assembly of Iowa, all railroads in this state were classified as follows:

Class C includes all roads whose gross annual earnings per mile are less than $3,000.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Class B includes all whose gross annual earnings are $3,000 per mile or over, but less than $4,000 per mile.

Class A includes all whose gross annual earnings are $4,000 per mile or more per annum.

This classification has been maintained and still constitutes the classification prescribed by statute. Section 2076, Supplement to Code.

The Fifteenth General Assembly fixed the passenger fare including ordinary baggage not exceeding 100 pounds in weight upon Class A roads at 3 cents, Class B 3½ cents, and Class C 4 cents per mile. These rates were perpetuated by section 2077 of the Code of 1897.

About 1905 there was a considerable demand for a reduction of passenger fares in the state, but the Legislature of that year failed to pass any legislation upon the subject. In his message to the Thirty-Second General Assembly, which convened in January, 1907, the Governor of Iowa said:

"The representatives of the railway companies, during the last session, insisted that the average actual rate paid by passengers in Iowa was not more than two cents per mile; some of the roads showing a fraction higher and some a fraction lower than two cents. In making this computation an arbitrary division of certain large expenses was assumed, and, as I understand it, free transportation was not included.

"This condition has been brought about by the railroads themselves, through mileage books, credentials, and other reduced rates to privileged classes. When it is remembered that the vast majority of those who travel a great deal pay but two cents per mile, and that the travel of all those of our people who pay three cents per mile is necessary to bring the average up to two cents per mile, the extent of travel which pays less than two cents per mile assumes tremendous proportions. Granting, for the moment, that it would be unfair to reduce the revenue from passenger service a single penny, it is still manifest that the adjustment is hopelessly wrong. It costs the railway company just as much to carry a passenger who has purchased a 2,000-mile book, per mile, as it does to carry a passenger who has bought a single ticket for 100 miles. Indeed, I think the former costs a little more, for the use of the mileage book entails more expense in the maintenance of extensive bureaus for identification, auditing, and rebating, than the sale of tickets at stations. The only advantage derived by the railway company is the interest upon the payment in advance, and this does not warrant any appreciable reduction in the rate.

"If the practice of making low rates for excursions, conventions, meetings of associations, and the like, is unprofitable, the railway companies can easily abolish it. For my part, I can see no justice in the custom which compels the farmer and his family, or the merchant and his family, as they go from place to place, either for pleasure or for business, to pay a part of the cost of carrying men to conventions or to gatherings of any kind; and much less can I perceive the wisdom of making our people pay, as they move about engaged in their ordinary affairs, for losses incurred in taking train load after train load of pleasure seekers to points of entertainment or amusement, or land seekers, as they journey to distant states in the hope of finding riches that they could more easily discover at home."

Thereupon the Legislature increased the ordinary baggage allowance for each passenger to 150 pounds and reduced the fare on Class A roads to 2 cents, Class B to 2½ cents, Class C to 3 cents, and for children 12 years of age and under provided for one-half of such fare. This was coupled with some additional provisions as previously with reference to the failure to purchase tickets and other matters.

The position of the Governor has been stated simply that the contemporaneous setting of the law may be more fully understood and it

is not to be implied that the court are of the opinion that anything the Governor or Legislature of 1907 did could bind the Legislature of 1912, much less make the action of the latter unconstitutional.

For many years there has been conducted at Des Moines, Iowa, a state fair on grounds owned by the state. Until 1900 this was conducted by the State Agricultural Society, but since that time by the Iowa Department of Agriculture. The state does not provide any support fund for the maintenance of this fair nor pay any of the yearly expenditures or premiums of the same, the statute providing that all expenses connected with the holding of the fair are to be paid out of the fair receipts. The state does, however, appropriate for improvements upon the state fair grounds as it appropriated originally for their purchase. This fair is one of the largest annual exhibitions in the country and is an educational institution on a large scale. It is a highly commendable enterprise and should be aided by all.

The Legislature of 1913, in an attempt to increase the attendance and the opportunity for attendance, passed the following law:

"All railroad corporations, according to their classification, as herein prescribed, shall be limited to compensation per mile, for the transportation of any person, with ordinary baggage not exceeding one hundred fifty pounds in weight, who shall purchase a round trip ticket from any point within this state to any town or city within said state at which an annual fair or exposition is being held, said ticket being good for return trip of said purchaser to point of origin during said fair or exposition, and at least one day after the conclusion of the same, as follows: Class A one and one-half cents; Class B two cents; Class C two and one-half cents; and for children twelve years of age or under one-half of the rate above prescribed, all of the aforesaid rates to apply to each mile traveled; provided, however, that said maximum rates of charge shall only apply on transportation to such points at which an annual fair or exposition has been held during one or more preceding years, and where the attendance during the immediately preceding year for any week or part thereof was not less than seventy-five thousand bona fide paid admissions; and it is further provided that upon application being made by any interested party, the state board of railroad commissioners shall, after full hearing, determine whether or not any given fair or exposition comes within the provisions of this statute; and in case such commission shall find that any given fair or exposition comes within said provisions, then, and in that case, the said commission shall prescribe the time and place at which the carriers shall perform the services for the rates of charge, as hereinbefore stated; and said commission shall by order designate what reasonable notice shall be given by said railway companies to the public of the rates aforesaid; and the said orders of the board of railroad commissioners shall be enforced in the same manner as is provided by law for the enforcement of other orders of the said commission." Acts 35th Gen. Assem. c. 165.

Thereupon the Iowa Railroad Commission, upon a petition filed by the Department of Agriculture of the state, entered the following order:

"It is therefore ordered that all railway companies operating in the state of Iowa, according to their classifications, as herein prescribed, shall be limited to compensation per mile for the transportation of any person, with ordinary baggage, not exceeding one hundred and fifty pounds in weight, who shall purchase a round trip ticket on any day from August 20th to 28th, inclusive, of this year, from any point within this state to Des Moines, said ticket being good for return trip of said purchaser to point of origin on any day between August 20th and 29th, inclusive, of this year, as follows: Class

A one and one-half cents; Class B two cents; Class C two and one-half cents, and for children twelve years of age or under, one-half of the rate above prescribed, all of the aforesaid rates to apply to each mile traveled. Said maximum rates of charges shall apply only to trips wholly within this state.

"The said companies are further required to give notice to the public of the said reduced rates by filing with the secretary of the board of railroad commissioners on or before ten o'clock July 17, 1913, a certified statement to that effect, and also by sending notice of the same on or before the fifteenth day of July to each and every passenger agent of said companies on duty within the state of Iowa."

These suits are brought by various railroads to enjoin these rates. While some at least of the bills charged that the rates thus established are confiscatory, applications for temporary injunctions have been submitted on the grounds that the legislation: First, denies to the railroads the equal protection of the laws; and, second, deprives them of their property without due process of law, in violation of the Constitution of the United States.

There can be no doubt of the right of the state to establish maximum rates of transportation so long as they are compensatory, but the question here is how far this power extends in the making of rates such as commutation rates, party rates, mileage rates, and excursion rates.

As to such rates there has been little legislation and still less of adjudication. It will be observed, however, that the rates here in question are not limited to those attending the state fair, but any person desiring to obtain a round trip ticket to Des Moines may do so for three-fourths of the ordinary fare at any time between August 20th and 29th of this year. It is insisted that this provision was necessary in order to make the rates legal. That is, that the state could not authorize the sale of round trip tickets to Des Moines to those attending the state fair unless it authorized the sale of the same tickets to all other persons at the same time. In this we cannot wholly concur.

[1] If the fact that the state fair is an educational institution furnishes the basis for this rate as contended, then we think it would have been lawful to have authorized the sale of such tickets only to persons going to the state fair. We cannot agree that the character of the state fair is such as to make it legal to make a discriminatory rate to Des Moines and that it would not have been legal to have restricted it to those going to the state fair. The basis of the contention of the state in this regard is that the state fair being an educational institution justifies an exception in the law as to the rates of transportation and that this classification requires that all persons be admitted at the same rates.

No authorities are cited to sustain this proposition. Of course, we realize that ordinarily the object of the law is to avoid discriminations in passenger rates, but the very object of the rule permitting the state to create classes will be done away with if the law be construed as claimed by the state.

While the state fair is an educational institution, there are many other educational institutions in Iowa, such as the State University, the State College at Ames, the State Normal School at Cedar Falls, meet-

ings of teachers' associations, the various short courses held in the counties, the meetings of the State Horticultural Society, the various district and county fairs held throughout the state. All these are educational in character and of only a little less importance to the local communities than the state fair is to Des Moines. There are at least a dozen other wholesale places in Iowa aside from Des Moines. There are a countless number of retailers who live equally distant from Des Moines and from some one of these cities. Des Moines is much the largest city in the state, and under this order as made all such persons can travel to any of these others cities at full fare or to Des Moines for three-fourths fare.

This law thus operates not only as a flagrant discrimination between those who are securing education at some point other than Des Moines, but it is a clear discrimination against those who are seeking to buy at wholesale or retail at some other city in Iowa than Des Moines.

Assuming for the sake of this case that the state fair constitutes such an educational institution as to justify a discrimination in its favor, we feel confident that the Constitution does not require that the state in making such discrimination as that contained in the order of the Railroad Commission shall make another discrimination against all the industries of the state except those at Des Moines.

This law as drawn not only discriminates as between cities and individuals, but is a violation of the long and short haul principle. To illustrate: One who wants to go from Davenport to Colfax will have to pay 2 cents each way, or $3.04; but to go from Davenport to Des Moines through Colfax he will only have to pay 1½ cents per mile, or $2.63, and less in the aggregate than it will cost to Colfax. If we take any point, A, which is more than four times as far from Des Moines as another point on the same line, B, the rate from A to Des Moines through B is less at 1½ cents per mile than the rate left in force from A to B at 2 cents.

If it is proposed to grant a reduced rate for educational purposes, as we understand it, there is no provision of the Constitution national or state which requires that the rate shall be extended to any but the persons who are the beneficiaries of such education. San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491; Interstate Consolidated Street Ry. Co. v. Massachusetts, 207 U. S. 79, 28 Sup. Ct. 26, 52 L. Ed. 111, 12 Ann. Cas. 555; Commonwealth v. Conn. Valley St. Ry., 196 Mass. 309, 82 N. E. 19; Commonwealth v. Boston & N. St. Ry. Co., 212 Mass. 82, 98 N. E. 1075.

If a law be valid requiring reduced fares for school children, it then necessarily follows that if the state fair is an educational institution a reduced fare can be allowed to those attending it.

[2] While it thus appears that the law violates the long and short haul principle and discriminates against wholesalers and retailers at all points in Iowa other than Des Moines, and discriminates in favor of one educational institution as against others equally meritorious and does so unnecessarily by extending the reduced fare to all persons going to Des Moines, and does not limit it to those going to the state fair, which could have been readily done by requiring tickets to be

stamped on the state fair grounds to make them good on the return trip, all this may not show that the law necessarily conflicts with the Constitution of the United States.

To determine that requires, as before stated, a consideration of the subject of commutation, party, mileage, and excursion tickets.

The question of commutation tickets has been repeatedly before the Interstate Commerce Commission. Sprigg v. B. & O. R. Co., 8 Interst. Com. Com'n R. 443; Commutation Rate Case, 21 Interst. Com. Com'n R. 428; Commutation Rate Case, 27 Interst. Com. Com'n R. 549.

In the Commutation Rate Case, 21 Interst. Com. Com'n R. 428, the Commission said:

"The literature relating to the origin and history of commutation rates is surprisingly meager and incomplete. As applied to passenger traffic, commutation seems to signify the payment in a single sum of the cost to the traveler for transportation, limited in point of time or in the number of trips, between two designated points; apparently it implies also a fare per trip that is less than the normal fare for a one-way journey. That use of the word is probably as old as steam transportation itself; the commuter not improbably antedates steam transportation although possibly not under that name. * * *

"As we have been able from various sources to gather some impression as to the history of commutation rates, there can be little doubt that commutation traffic was regarded originally as a mere incident to through traffic and was attractive because it could be handled at little additional cost to the carrier. Besides adding volume to the regular passenger traffic and thus tending materially to reduce the operating cost per passenger, it had the effect of substantially increasing the freight traffic. There is much testimony of record on this point. It tends to show that the freight tonnage moving between substantial suburban communities and adjacent large centers is often very considerable; and that there is a certain reciprocal relation between the carrier and its commuters in that while the latter enjoy special fares they create a general traffic that would not otherwise exist. It was for these reasons that the carriers found it of advantage not only to encourage the establishment of permanent homes adjacent to the large industrial cities, but to take steps to stimulate and advance the growth of suburban life and to make it attractive and agreeable. Having the tracks, the stations, and the equipment, suburban traffic was for a long time more or less a by-product of through traffic, and that is still the case in many instances. But it is undeniable that the enormous growth of suburban communities in recent years, and particularly around the great cities such as New York and Chicago, has resulted in material changes both in the character and the cost of commutation service. The increasing demands of commuters for more frequent trains and a faster time schedule, for club cars and parlor cars, and other conveniences, have undoubtedly minimized it as a factor tending to a reduction in the unit of cost of passenger traffic; and instead of being an incident to through traffic and valuable because it added volume to it without adding proportionately to the cost and thus tended to a reduction in the operating expense per passenger, commutation traffic in many instances is now moved at a comparatively high operating expense. In some cases it has become an independent and special service, conducted largely in special trains with special equipment and motive power, and very often even on special tracks, and frequently with special stations. * * *

"Without going further into the history of commutation or the details that distinguish it from other passenger traffic, we are led to conclude from all these considerations that it stands by itself as a special and distinct kind of service for which the carrier may demand no more than a reasonable compensation. Excursion traffic is sporadic and occasional and altogether exceptional. But it does not follow, because section 22 provides that nothing in the act 'shall prevent the issuance of excursion tickets,' that no other pro-

vision in the act has any application to excursion tickets. On the contrary, we have held that carriers must publish and post their excursion rates as required in section 6; and with respect to some kinds of excursion traffic we have also applied section 4. We have not applied section 3 to excursion fares in the few cases that have come before us, but in the progress of time it is not improbable that complaints may arise where unusual conditions and special facts will require the enforcement of that section and also of section 2. . Section 1, requiring that all rates must be reasonable, in the very nature of things can have no real application to excursion fares. This is perhaps no less true of mileage book rates. But it will not do to say that as section 1 cannot be enforced with respect to excursion and mileage book tickets it therefore has no application to commutation tickets. Nor does it follow, because the act provides that nothing therein 'shall prevent the issuance of commutation tickets,' that no other provision of the act applies to such tickets, and that we are without power under section 1 to regulate the reasonableness of the fares demanded for such a service. Necessarily that must depend somewhat upon the character of the service. Unlike excursion traffic, commutation traffic is neither occasional nor sporadic, but on the contrary is characterized by an unusual regularity in volume; it may be accurately measured and provided for more readily than in the case of any other kind of passenger traffic. It is ordinarily constant, except as it may gradually grow in volume. Its stability is.established by the juxtaposition of a community of homes and a community of workshops; and this separation of the place of residence from the place of work is in many cases the direct result of the efforts of the carrier. It has been encouraged, developed, and fostered by the carriers, and large and numerous suburban communities have grown up in the belief, not that some fare less than the normal full passenger fare would be demanded in the future, but in the belief, as heretofore stated, that no more than a just and reasonable fare would at any time be exacted, considering the special character of the traffic and of the service and the conditions that differentiate both the traffic and the service so completely and absolutely from all other kinds of passenger traffic and service. That it has been regarded as a different class of traffic conducted under entirely different conditions and a different kind of service is shown not only by the origin of commutation and the subsequent traditions that have accumulated with its growth but by the general recognition of it by the carriers themselves as an independent and a special service. Suburban communities have grown into existence on the theory voluntarily accepted by the carriers as well as by the public that one who makes daily use of an agency of transportation between his place of business and his home must necessarily be accorded a special and a low rate. This theory is firmly fixed in the history and traditions of transportation by rail and must therefore be regarded as embraced in the law under which such transportation is regulated."

Again the Commission in the opinion said:

"It will not be necessary to dwell here upon the importance of the question not only to the particular suburban communities involved on the record before us, but to many other such communities throughout the country, the prosperity and growth of which largely depend upon an efficient and reasonable commutation service. Many such communities have not only been encouraged by the carriers, but were, in fact, originally established largely on their initiative. Suburban property has been bought, homes have been established, business relations made, and the entire course of life of many families adjusted to the conditions created by a commutation service. This may not have been done on the theory that the fares in effect at any particular time would always be maintained as maximum fares, but countless homes have been established in suburban communities in the belief that there would be a reasonable continuity in the fares and that the carriers in any event would perform the service at all times for a reasonable compensation."

This opinion has never been passed upon by the courts, but the reasoning of Mr. Commissioner Harlan is quite cogent and persuasive.

We come next to the consideration of party rates. They were deemed illegal by the Interstate Commerce Commission, but upon suit being brought to enforce its order its action was reversed by the Supreme Court of the United States. Interstate Commerce Commission v. B. & O. R. R. Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699. From that case it appears that party rates were then adjudged to be legal. It was the practice of the railroads to issue a single ticket for ten persons or more at reduced rates. In that case the Supreme Court quoted with approval the opinion of Judge Sage in the court below that:

"The difference between commutation and party-rate tickets is that commutation tickets are issued to induce people to travel more frequently, and party-rate tickets are issued to induce more people to travel. There is, however, no difference in principle between them, the object in both cases being to increase travel without unjust discrimination, and to secure patronage that would not otherwise be secured."

In that case no question was raised as to the power of Congress to establish rates on party tickets or to authorize the Commission to do so.

Turning now to the question of mileage rates, the Legislature of Michigan passed a law providing that a 1,000-mile ticket should be kept on sale at a price not exceeding $20 in the lower peninsula and $25 in the upper peninsula; that such 1,000-mile ticket might be made nontransferrable, but whenever requested by the purchaser they should be issued in the name of the purchaser and wife and children, these tickets should be valid for two years after the date of purchase and contained various other provisions.

The Supreme Court, in Lake Shore & Michigan Southern Ry. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858, said:

"It is said that the power to create this exception is included in the greater power to fix rates generally; that, having the right to establish maximum rates, it therefore has power to lower those rates in certain cases and in favor of certain individuals, while maintaining them or permitting them to be maintained at a higher rate in all other cases. It is asserted also that this is only a proper and reasonable regulation.

"It does not seem to us that this claim is well founded. We cannot regard this exceptional legislation as the exercise of a lesser right which is included in the greater one to fix by statute maximum rates for railroad companies. The latter is a power to make a general rule applicable in all cases and without discrimination in favor of or against any individual. It is the power to declare a general law upon the subject of rates beyond which the company cannot go, but within which it is at liberty to conduct its work in such a manner as may seem to it best suited for its prosperity and success. This is a very different power from that exercised in the passage of this statute. The act is not a general law upon the subject of rates, establishing maximum rates which the company can in no case violate. The Legislature having established such maximum as a general law now assumes to interfere with the management of the company while conducting its affairs pursuant to and obeying the statute regulating rates and charges, and notwithstanding such rates it assumes to provide for a discrimination, an exception in favor of those who may desire and are able to purchase tickets at what might be called wholesale rates—a discrimination which operates in favor of the wholesale buyer, leaving the others subject to the general rule. And it assumes to regulate the time in which the tickets purchased shall be valid and to lengthen it to double the period the railroad company has ever

before provided. It thus invades the general right of a company to conduct and manage its own affairs, and compels it to give the use of its property for less than the general rate to those who come within the provisions of the statute, and to that extent it would seem that the statute takes the property of the company without due process of law. We speak of the general right of the company to conduct and manage its own affairs; but at the same time it is to be understood that the company is subject to the unquestioned jurisdiction of the Legislature in the exercise of its power to provide for the safety, the health, and the convenience of the public, and to prevent improper exactions or extortionate charges from being made by the company.

"It is stated upon the part of the defendant in error that the act is a mere regulation of the public business, which the Legislature has a right to regulate, and its apparent object is to promote the convenience of persons having occasion to travel on railroads and to reduce for them the cost of transportation; that its benefit to the public who are compelled to patronize railroads is unquestioned; that it brings the reduction of rates of two cents per mile within the reach of all persons who may have occasion to make only infrequent trips; and that there is no reason why the Legislature may not fix the period of time within which the holder of the ticket shall be compelled to use it. The reduction of rates in favor of those purchasing this kind of ticket is thus justified by the reasons stated.

"The right to claim from the company transportation at reduced rates by purchasing a certain amount of tickets is classed as a convenience. As so defined, it would be more convenient if the right could be claimed without any compensation whatever. But such a right is not a 'convenience' at all within the meaning of the term as used in relation to the subject of furnishing conveniences to the public. And also the convenience which the Legislature is to protect is not the convenience of a small portion only of the persons who may travel on the road, while refusing such alleged convenience to all others; nor is the right to obtain tickets for less than the general and otherwise lawful rate to be properly described as a convenience. If that were true, the granting of the right to some portion of the public to ride free on all trains and at all times might be so described. What is covered by the word 'convenience' it might be difficult to define for all cases, but we think it does not cover this case. An opportunity to purchase a 1,000-mile ticket for less than the standard rate we think is improperly described as a convenience.

"The power of the Legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community and to carry the members of that class at a less sum than it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation. We do not deny the right of the Legislature to make all proper rules and regulations for the general conduct of the affairs of the company, relating to the running of trains, the keeping of ticket offices open, and providing for the proper accommodation of the public.

"This act is not like one establishing certain hours in the day during which trains shall be run for a less charge than during the other hours. In such case it is the establishing of maximum rates of fare for the whole public during those hours, and it is not a discrimination in favor of certain persons by which they can obtain lower rates by purchasing a certain number of tickets by reason of which the company is compelled to carry them at the reduced rate, and thus, in substance, to part with its property at a less sum than it would be otherwise entitled to charge. The power to compel the company to carry persons, under the circumstances as provided for in this act, for less than the usual rates, does not seem to be based upon any reason which has hitherto been regarded as sufficient to authorize an interference with the corporation, although a common carrier and a railroad.

"The act also compels the company to carry not only those who choose to purchase these tickets, but their wives and children, and it makes the tickets good for two years from the time of the purchase. If the Legislature can, under the guise of regulation, provide that these tickets shall be good for two years, why can it not provide that they shall be good for five or ten or even

a longer term of years? It may be said that the regulation must provide for a reasonable term. But what is reasonable under these circumstances? Upon what basis is the reasonable character of the period to be judged? If two years would, and five years would not, be reasonable, why not? And if five years would be reasonable, why would not ten? If the power exists at all, what are the factors which make it unreasonable to say that the tickets shall be valid for five or for ten years? It may be said that circumstances can change within that time. That is true, but circumstances may change within two just as well as within five or ten years. There is no particular time in regard to which it may be said in advance and as a legal conclusion that circumstances will not change. And can the validity of the regulation be made to depend upon what may happen in the future, during the running of the time in which the Legislature has decreed the company shall carry the purchaser of the ticket? Regulations for maximum rates for present transportation of persons or property bear no resemblance to those which assume to provide for the purchase of tickets in quantities at a lower than the general rate, and to provide that they shall be good for years to come. This is not fixing maximum rates, nor is it proper regulation. It is an illegal and unjustifiable interference with the rights of the company. * * *

"If the Legislature can interfere by directing the sale of tickets at less than the generally established rate, it can compel the company to carry certain persons or classes free. If the maximum rates are too high in the judgment of the Legislature, it may lower them, provided they do not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. What right has the Legislature to take from the company the compensation it would otherwise receive for the use of its property in transporting an individual or classes of persons over its road, and compel it to transport them free or for a less sum than is provided for by the general law? Does not such an act, if enforced, take the property of the company without due process of law? We are convinced that the Legislature cannot thus interfere with the conduct of the affairs of corporations.

"But it may be said that as the Legislature would have the power to reduce the maximum charges for all, to the same rate at which it provides for the purchase of the 1,000-mile ticket, the company cannot be harmed or its property taken without due process of law when the Legislature only reduces the rates in favor of a few instead of in favor of all. It does not appear that the Legislature would have any right to make such an alteration. To do so might involve a reduction of rates to a point insufficient for the earning of the amount of remuneration to which a company is legally entitled under the decisions of this court. In that case reduction would be illegal. For the purpose of upholding this discriminatory legislation we are not to assume that the exercise of the power of the Legislature to make in this instance a reduction of rates as to all would be legal, and therefore a partial reduction must be also legal. Prima facie, the maximum rates as fixed by the Legislature are reasonable. This, of course, applies to rates actually fixed by that body.

"There is no presumption, however, that certain named rates which it is said the Legislature might fix but which it has not, would, in case it did so fix them, be reasonable and valid. That it has not so fixed them affords a presumption that they would be invalid, and that presumption would remain until the Legislature actually enacted the reduction. At any rate, there is no foundation for a presumption of validity in case it did so enact, in order to base the argument that a partial reduction, by means of this discrimination, is therefore also valid. And this argument also loses sight of the distinction we made above between the two cases of a general establishment of maximum rates and the enactment of discriminatory, exceptional, and partial legislation upon the subject of the sale of tickets to individuals willing and able to purchase a quantity at any one time. The latter is not an exercise of the power to establish maximum rates.

"True it is that the railroad company exercises a public franchise, and that its occupation is of a public nature, and the public therefore has a certain interest in and rights connected with the property, as was held in Munn v.

Illinois, 94 U. S. 113, 125 [24 L. Ed. 77], and the other kindred cases. The Legislature has the power to secure to the public the services of the corporation for reasonable compensation, so that the public shall be exempted from unreasonable exactions, and it has also the authority to pass such laws as shall tend to secure the safety, convenience, comfort, and health of its patrons and of the public with regard to the railroad. But in all this we find it neither necessary nor appropriate, in order that the Legislature may exercise its full right over these corporations, to make such a regulation as this, which discriminates against it and in favor of certain individuals, without any reasonable basis therefor, and which is not the fixing of maximum rates or the exercise of any such power.

"The Legislature having fixed a maximum rate at what must be presumed, prima facie, to be also a reasonable rate, we think the company then has the right to insist that all persons shall be compelled to pay alike, that no discrimination against it in favor of certain classes of married men or families, excursionists, or others, shall be made by the Legislature. If otherwise, then the company is compelled at the caprice or whim of the Legislature to make such exceptions as it may think proper and to carry the excepted persons at less than the usual and legal rates, and thus to part in their favor with its property without that compensation to which it is entitled from all others, and therefore to part with its property without due process of law. The affairs of the company are in this way taken out of its own management, not by any general law applicable to all, but by a discrimination made by law to which the company is made subject. Whether an act of this nature shall be passed or not is not a matter of policy to be decided by the Legislature. It is a matter of right of the company to carry on and manage its concerns subject to the general law applicable to all, which the Legislature may enact in the legal exercise of its power to legislate in regard to persons and things within its jurisdiction. * * *

"But in this case it is not a question of 'convenience' at all within the proper meaning of that term. Aside from the rate at which the ticket may be purchased, the convenience of purchasing this kind of a ticket is so small that the right to enact the law cannot be founded upon it. It is no answer to the objection to this legislation to say that the company has voluntarily sold 1,000-mile tickets good for a year from the time of their sale. What the company may choose voluntarily to do furnishes no criterion for the measurement of the power of a Legislature. Persons may voluntarily contract to do what no Legislature would have the right to compel them to do. Nor does it furnish a standard by which to measure the reasonableness of the matter exacted by the Legislature. The action of the company upon its own volition, purely as a matter of internal administration, and in regard to the details of its business which it has the right to change at any moment, furnishes no argument for the existence of a power in a Legislature to pass a statute in relation to the same business imposing additional burdens upon the company. * * *

"In this case there is not an exercise of the power to fix maximum rates. There is not the exercise of the acknowledged power to legislate so as to prevent extortion or unreasonable or illegal exactions. The fixing of the maximum rate does that. It is a pure, bald, and unmixed power of discrimination in favor of a few of the persons having occasion to travel on the road and permitting them to do so at a less expense than others, provided they buy a certain number of tickets at one time. It is not legislation for the safety, health, or proper convenience of the public, but an arbitrary enactment in favor of the persons spoken of, who in the legislative judgment should be carried at a less expense than the other members of the community. There is no reasonable ground upon which the legislation can be rested unless the simple decision of the Legislature should be held to constitute such reason. Whether the Legislature might not in the fair exercise of its power of regulation provide that ordinary tickets purchased from the company should be good for a certain reasonable time is not a question which is now before us, and we need not express any opinion in regard to it.

"In holding this legislation a violation of that part of the Constitution of the United States which forbids the taking of property without due process

of law, and requires the equal protection of the laws, we are not, as we have stated, thereby interfering with the power of the Legislature over railroads as corporations or common carriers, to so legislate as to fix maximum rates, to prevent extortion or undue charges, and to promote the safety, health, convenience, or proper protection of the public. We say this particular piece of legislation does not partake of the character of legislation fairly or reasonably necessary to attain any of those objects, and that it does violate the federal Constitution as above stated."

In Wisconsin, Minnesota & Pacific R. v. Jacobson, 179 U. S. 287, 297, 21 Sup. Ct. 115, 119 (45 L. Ed. 194), the court said:

"While this power of regulation exists, it is also to be remembered that the Legislature cannot under the guise of regulation interfere with the proper conduct of the business of the railroad corporation in matters which do not fairly belong to the domain of reasonable regulation."

The decision in Lake Shore & Michigan Southern Ry. Co. v. Smith, has been followed in Beardsley v. New York, Lake Erie & Western Ry. Co., 162 N. Y. 230, 56 N. E. 488; in Commonwealth v. Atlantic Coast Line Railroad Co., 106 Va. 61, 55 S. E. 572, 7 L. R. A. (N. S.) 1086, 117 Am. St. Rep. 983, 9 Ann. Cas. 1124; in State v. Great Northern Railway Co., 17 N. D. 370, 116 N. W. 89; and has been cited by the Supreme Court of Iowa in State v. O. & C. B. Ry. Co., 113 Iowa, 30, 84 N. W. 983, 52 L. R. A. 315, 86 Am. St. Rep. 357.

It is suggested that what is said in the Michigan case about the inability to fix rates for two years was mere dictum, and that the Interstate Commerce Commission has since been expressly authorized to fix rates for the same time, namely, two years.

True, the Interstate Commerce Commission is authorized to prescribe rates for two years. That is to say, it is provided by section 15 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) as amended (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1284]):

"All orders of the Commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the Commission, unless the same shall be suspended or modified or set aside by the Commission or be suspended or set aside by a court of competent jurisdiction."

In other words, if a rate should be prescribed and should be put in operation and at the end of one year should become confiscatory, there is no decision, so far as we know, that it could not then be set aside; but if the company issued a ticket, a contract to carry passengers for two years, the contract must be performed, and what the Supreme Court said upon this subject has not been modified by the Interstate Commerce Act.

It is suggested in one of the briefs that much of the so-called dicta in the Michigan case "have received many modifications the most notable of which are contained in recent decisions of the Interstate Commerce Commission."

While entertaining the highest respect for the Interstate Commerce Commission, we cannot conceive that it has any power to modify a rule laid down by the Supreme Court, and in justice to the Commission it has always respectfully declined to do so.

It must be·freely conceded in this case that the state has power to prescribe maximum rates which permit a fair return to the carriers, and this involves the power to regulate suburban commutation rates to and from points reasonably adjacent to large cities, certainly where such rates have been long established and districts have been settled upon the reliance of the granting of such rates, and perhaps, though that has not been expressly recognized, such rates may be established by the government as an original proposition where they have not been established by the railroad companies. It may also be presumed for the purposes of this discussion that the state has power to prescribe reduced rates for school children and the inmates of state institutions and for the National Guard, all of which inure directly and expressly to the benefit of the state, within the exercise of its right to promote the safety, health, convenience, and proper protection of the public.

We have already stated that the state fair is educational in its nature, and that many other large enterprises of a similar character are in some respects educational in their nature, and for the sake of this case we may concede that the state may properly recognize such as are legitimate beneficiaries of its bounty or worthy of its encouragement.

While the Michigan case was upon the question of mileage books, what is there said in reference to excursion tickets—and such we understand the tickets authorized by this act and order to be—is so persuasive that we must follow it until it shall have been modified by the Supreme Court. We find nothing in the later decisions of the Supreme Court which indicates a purpose to dissent from the principles therein announced. It must therefore be accepted by us as settled that the Legislature cannot enact a law making maximum rates and then proceed to make exceptions to it in favor of such persons as the legislative judgment may deem proper. It cannot invade the general right of the railroad company to conduct and manage its own affairs and compel it to give the use of its property for less than the rate it has itself fixed and which is therefore presumptively fair and reasonable. When maximum rates have been declared, they are presumed to be reasonable, and the Legislature is presumed to have fixed such rates upon reasonable basis after due investigation and consideration. It may not then depart from them in sporadic instances. It may not tell the company to charge smaller rates for conventions, church or political, or for other excursions, at least unless it be strictly limited to those attending the meeting which is deemed educational. The power when exercised must affect directly, peculiarly, and exclusively the public interest which may properly be promoted.

The question is whether the Legislature, having fixed the presumptively reasonable rates, may prescribe excursion and other extraordinary rates at greatly reduced fares.

If it may do this in one specific instance, it may multiply such occasions without let or hindrance. The conduct of the railroad's business will be transferred almost entirely to other hands, and its revenues greatly impaired, and that in the face of the fact that probably reasonable maximum rates have already been established which were

claimed by their authors to be dictated by the consideration that within the limits of such rates the roads might be free to increase their revenues by any legitimate and not extortionate system of management. This is doubtless why not only the Supreme Court but the Interstate Commerce Commission has set its face against any and all capricious and sporadic departure from such rates when once established.

As the Supreme Court said:

"If the maximum rates are too high in the judgment of the Legislature, it may lower them provided they do not make them unreasonably low as that term is understood in the law."

This does not mean that these rates may be attacked indirectly, without system, and in such manner as to leave them wholly unsettled and unable to be adjusted by any known and dependable principle, and so the court has said, and in view of the scope of the decision the pronouncement cannot be described as dictum, that it is not within the power of the Legislature to compel the company to charge smaller rates for excursions and similar extraordinary occasions.

Without any intention whatever to reflect upon the Legislature, its action is an attempt to establish the principle of legislative authority to prescribe mere excursion rates under the form of an exercise of the police power for the promotion of the public's convenience and interest. If any court or commission has ruled that in prescribing rates for an educational institution the Legislature is not confined to those attending such institution, it would seem that its conclusions are at variance with those of controlling authority. The fact that this law applies to all persons going to Des Moines either to attend the state fair or otherwise would itself invalidate it.

We recognize the rule that a temporary injunction against the enforcement of an act of the state Legislature fixing rates is seldom granted until after a trial of the rates if there is a bona fide resistance made by the state and there exists any doubt whatever as to the facts, but the question here involved is much broader than that embraced in such cases. Here it is not a question of whether the particular rate will be confiscatory or not. There is no conceivable chance of profit to the railroad company which would make this law valid. The court could not be further enlightened by additional disclosures of material evidence. On the other hand, the injury flowing from the unwarranted order would be accomplished and irreparable.

The question of confiscation is eliminated by a disclaimer.

In the view here taken the consideration of whether the carriers have in the past voluntarily established rates for this fair or other institution becomes immaterial. It has been decided that they cannot for that reason be compelled to do so again.

The city of Des Moines with its size, wealth, and its prestige has no need for discriminating rates from all parts of the state in its favor, and the state cannot exercise the right to reduce maximum rates to a fair return based upon investment and earnings, and then still insist upon the same gratuities voluntarily granted by the carriers when left in undisturbed control of their income.

While the railroads are subject to legislation providing rules for securing faithful and efficient service and equality between shippers and communities, the public is in no proper sense their general manager. Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 172, 18 Sup. Ct. 45, 42 L. Ed. 414; Interstate Commerce Commission v. Chicago Great Western Ry. Co., 209 U. S. 108, 28 Sup. Ct. 493, 52 L. Ed. 705. So long as any feature of private ownership is recognized by the law, the state must not proceed upon an assumed basis of unrestricted governmental control amounting practically to government ownership.

Our conclusion is that the question as to the validity of the act in question and the order of the Railroad Commission made in pursuance thereof involves the power of the state and not the reasonableness of the requirement. So viewed, it falls within the inhibition of the constitutional guaranties as construed by the Supreme Court, and a temporary injunction should be issued as prayed.

It will be ordered in each of the cases that a temporary injunction issue as prayed upon the complainant giving bond in the sum of $5,000. All concur.