CHICAGO, B. & Q. R. CO. *v.* DEY *et al.*, Railroad Commissioners.

CHICAGO, M. & ST. P. RY. CO. *v.* SAME.

(*Circuit Court, S. D. Iowa, C. D.* February 2, 1889.)

1. RAILROAD COMMISSIONERS—REGULATION OF CHARGES.

Act Iowa, April 5, 1888, provides for the regulation of transportation charges by railroad companies, and for a board of commissioners to fix reasonable charges. Section 17 requires said board to make a schedule of maximum rates, which shall be deemed *prima facie* reasonable. Sections 18 and 20 provide that any person may complain that the charges made or published by any company, are higher than those fixed by the schedule, or that the latter are unreasonably high, upon which the board shall investigate the complaint. The decision made thereon shall set out the maximum rates to be charged thereafter, and neither the decision nor the schedule therein contained shall be limited to the case complained of, but shall extend to all such rates between points in the state, and to whatever part of the line of said road within the state as may have been fairly within the scope of the investigation. *Held,* that the power to make a full schedule is not only conferred by section 17, but is given also by said other sections, in case a complaint has been made and investigated.

**2. SAME.**

On a bill to restrain the board from carrying into effect a schedule of rates so established on the ground that they are so low as to be ruinous to the business of the road, if the evidence as to the probability of loss is so conflicting that the effect of the rates is doubtful, and largely dependent on future developments, and only about 4 per cent. of the local traffic will be affected by the reduced rate, relief will not be granted until experience has demonstrated that the rates are not compensatory.

**3. SAME—VIOLATION OF INJUNCTION.**

It is not a violation of a temporary injunction against putting in force a schedule of rates made pursuant to said section 17, on the ground that they were unreasonably low, for the commissioners to make another schedule after investigating a complaint filed against rates charged by a railroad company, although the purpose of those making the complaint was to evade the injunction, and their conduct in attempting to procure a favorable decision on the complaint was improper, as the duty of the commissioners under the statute was to hear the complaint and establish proper rates.

Bill by the Chicago, Burlington & Quincy Railroad Company, to restrain Peter A. Dey and others, constituting the board of railroad commissioners of the state of Iowa, from putting in force a schedule of charges. A preliminary injunction was granted in this and two other similar cases, but one opinion being filed, *Railway Co.* v. *Dey,* 35 Fed. Rep. 866, to which reference is made for a fuller discussion of the questions herein considered, and for the statute under which the commissioners acted in making the schedule complained of.

*Wirt Dexter,* for complainant.

*A. J. Baker,* Atty. Gen., for defendants.

BREWER, J. This case is submitted on an application for a temporary injunction. On the 28th of June, 1888, this complainant filed a bill in this court asking an injunction restraining the defendants as railroad commissioners of the state of Iowa from putting in force a certain schedule of rates on freight. After a lengthy hearing, and on the 27th day of July, a temporary injunction was issued as prayed for. Now the complainant files this, a supplemental bill, alleging that defendants are seeking to evade the force of that injunction, and to cast upon complainant a schedule of rates substantially the same as that heretofore enjoined, or at least that the difference is so slight as to indicate a mere evasion. The gist of the complaint is that certain jobbers and manufacturers of Iowa, interested in reducing the rates of freight, formed associations for that purpose, and employed special counsel to assist the attorney general in resisting the original application. That after the injunction had been granted a meeting of such jobbers and manufacturers was held in Davenport on August 14th, for the purpose of devising and adopting a plan of procedure for evading the operation of such injunction. In pursuance of the plan devised a circular was sent out, marked "Strictly Confidential," to various parties in the state, in which it was recited that sections 18, 19, and 20 authorized complaints to the railroad commissioners of every unreasonable charge, and required the commissioners upon such complaints to summon the railroad making such charge to appear and show that it was a reasonable one; and, if found by the com-

v.38F.no.8—42

missioners to be unreasonable, they were to make a reasonable rate which would become *prima facie* evidence; and further, that when such rates were once established the railroad would become liable for all the penalties. The circular then reads:

"Therefore the committee recommended that the jobber at every shipping and manufacturing point secure evidence of the unreasonable rates being collected by the railroads, and file them with the proper petition with the railroad commissioners at once. This plan being carried out at all points would quickly enable the commissioners to establish schedule rates which the railroad managers could neither question nor controvert as *prima facie* evidence of reasonable rates, and they would be in force until their unreasonableness was declared by the courts, the important point being to get the rates into effect at once, and have them in effect while the litigation is proceeding."

In pursuance of this plan a complaint was filed by Robert Donahue and others, alleging generally that the railroad company, complainant herein, had attempted to put in force schedules of rates unreasonable and extortionate, and praying for an examination. Upon the hearing, after objection by the railroad company, a full schedule of rates for complainant's road in the state of Iowa was prescribed by the commissioners, and then follows a matter which it is painful to record. The three gentlemen who had been railroad commissioners were candidates for election at the November election. A decision of this complaint was filed with the secretary on the 3d day of November, three days before the election, signed by two of the commissioners. The third appended to that decision the following:

"Mr. Fred Wilde of Davenport, secretary of the Twin Cities' Freight Association, in a letter dated October 31, has threatened me in the name of the jobbers of the state with their opposition to my candidacy for railroad commissioner unless the opinion of this board in the Davenport case was made public on or before Friday, November 2, 1888. I infer that the demand is that the decision must be in compliance with their views. In this situation I am compelled by my feelings of self-respect to decline until after election to give any expression of my views upon the subject. I do not believe that a public officer whose duty it is to determine questions of this kind, which are practically judicial, should allow personal interests to sway his judgment.
    [Signed]                                    "PETER A. DEY.
"*Des Moines, Nov.* 3, 1888."

It is further alleged that this schedule adopted by the commissioners was the same as that they were enjoined from putting in force, with merely a change in the classification from the so-called "Illinois" to the so-called "Western" classification, that making a difference of only $2\frac{1}{2}$ per cent. in the complainant's earnings,—the former schedule reducing them 30 per cent., and the latter $27\frac{1}{2}$ per cent.; and also that this schedule is unreasonable in that by it the complainant would not earn its operating expenses and fixed charges. It is still further asserted that sections 18, 19, and 20, under which these proceedings were had, gave no authority for the making of an entire schedule, and only aim at the correction of a single wrong in the matter of charges.

To this bill of complaint defendants have filed an answer, averring

that in their actions they were simply obeying the commands of the statute; that a complaint was duly filed with them charging excessive rates on the part of the complainant; that they gave notice to complainant, a hearing was had, and that they endeavored to obtain evidence as to the actual cost of the railroad property in Iowa, or a fair and reasonable cost of such property, as well as the relation of such cost to the bonds and stocks upon which interest and dividends were claimed; that they failed to receive from complainant any satisfactory information; that they heard all the testimony that was offered on either side, and made their decision on such testimony; that the complainant in fact is seeking dividends on watered stock. They further aver that they had no part in the transactions of the jobbers and manufacturers; and with reference to the letter received by Mr. Dey the other commissioners say they received no letter or other communication of any nature or kind, verbal or written, in respect to their action prior to the making and signing of the decision; that that decision was made and signed on the 26th of October, and was not then announced on account of the absence of Mr. Dey, and because they were waiting for his action. With reference to the allegation in the bill that the change in the classification from the Illinois to the Western makes but a slight change in the earnings of the complainant,—a difference of only $2\frac{1}{2}$ per cent.,—they aver that if such fact was shown by any calculation made by the complainant it was not communicated to them; and that the only evidence they had on that subject was the affidavit of complainant's general manager filed on the original hearing, averring that the two classifications made a difference of about 15 per cent., and also the bills filed by the three railroad companies at that time, in one of which (the complainant's bill) it was alleged that "a comparison between the Western classification being used by some fifty or more roads west of Chicago, and the Illinois classification which the Iowa commissioners proposed to adopt for their new rates, computed upon a basis of one hundred mile distances, in each case shows an average reduction of about fifty per cent. upon fifteen or twenty per cent. of the total number of articles named in the classification, and these articles so reduced comprise about three-fourths of the entire tonnage of the state of Iowa." They further say that upon the hearing before them they inquired in reference to this matter of the complainant's general manager, and his reply was in accordance with the foregoing statements, and then generally allege that the schedule as prepared by them is reasonable and just, and will, if enforced everywhere on complainant's line, enable it to pay operating expenses and fixed charges, and beyond that a handsome dividend.

This summary of the bill of complaint and answer discloses the questions presented, and in support of these matters quite a volume of testimony has been presented, consisting of affidavits, testimony taken before the commissioners upon the hearing of the complaint, and upon which they acted in comparing the schedule with the reports of the complainant of its business to the railroad commissioners of Iowa for the last two or three years. This amount of testimony, as well as the intricacies

and difficulties of the questions involved, is the reason for the time which has been taken for examination in reaching my conclusions.

There are substantially three questions presented. *First.* Has there been an invasion of the injunction order heretofore issued, and therefore a practical contempt of that order? *Second.* Did the sections of the statute under which the commissioners acted give authority to render such decision and establish a full schedule of rates for the complainant? *Third.* Is the schedule announced just and reasonable?

With reference to the first question there is little room for doubt. In the injunction which was issued there was no assumption of power to prescribe rates, and no pretense of interfering with the commissioners in the discharge of any duties imposed upon them by statute. The limits of judicial interference were, I think, clearly stated in the opinion filed. *Railway Co.* v. *Dey*, 35 Fed. Rep. 866. Beyond that limit, as I said, the courts have no power to go; and the whole matter is relegated to the discretion of the commissioners. It would be strange indeed, after the various adjudications of the supreme court, if any court should assume to prescribe a schedule of rates. Again, the commissioners acted simply upon complaints filed. They could not abandon the duty cast upon them by the statute of receiving and acting upon such complaints. Whatever misconduct may be imputed to the jobbers' association as a whole, or any individual members thereof, none can be imputed to the commissioners. A tribunal, judicial or *quasi* judicial, is not to be held responsible for the conduct of the litigants before it, and there is no reason to doubt that the commissioners acted with the utmost impartiality, giving full hearing to both parties, and deciding according to their honest judgment. While the obvious attempt to influence the opinion of Mr. Dey was a gross outrage, it is pleasing to note the manliness with which the insult was resented. In these days, when too many officials trim their course to meet public favor, it is pleasing to note such courage of conviction, such unwillingness to even appear to be influenced by personal interest or public demand in discharge of official duties, as Mr. Dey manifested. And it is pleasing also to notice the fact that, although Mr. Dey was running on the Democratic ticket, which received several thousand votes less than the Republican, he, and he alone, on his ticket was elected. Obviously the people of Iowa respect independence as well as integrity in office. Nor is there any reason to believe that the other commissioners were influenced by public clamor. Again, while it may be true that the difference between the Illinois and the Western classification is slight in its practical application to the local freight in Iowa, yet, as the commissioners were advised by the complainant itself that the difference was great, it is not to be wondered at that they took the complainant at its word. And finally it must be observed that the question what are reasonable rates is—as perhaps none know better than these commissioners —one of exceeding intricacy and difficulty, and it would be strange indeed, if an honest effort on their part to solve that question in the discharge of their official duties could be denounced as an intentional contempt of judicial orders. I think I but voice the opinion of every indi-

vidual who has been drawn to take any part in this litigation, that we all of us are simply searching after the truth.

With reference to the second question, the contention of complainant is that sections 18, 19, and 20 contemplate simply the inquiring by the commissioners into an alleged overcharge in a particular shipment, with power to declare what was a reasonable charge, and to make that determination applicable in the future to all charges of a kindred nature; that only under section 17 could the commissioners proceed to make a full schedule. My first reading of the statute gave me the same view, but subsequent examination convinces me that such is not the correct construction. Section 17 undoubtedly authorizes the commissioners on their own motion to proceed and establish schedules of rates for all the railroads; indeed, it directs them so to do. Under this section they proceed, not under any complaint, but simply obeying the mandate of the legislature. Sections 18, 19, and 20 contemplate proceedings against a particular railroad company upon complaint made. Under these sections the board proceeds, not upon its own motion, but only in response to the application of some party. While the proceeding is *quasi* judicial in that there is a complainant and defendant,—the latter brought in by notice and a hearing and decision,—yet the scope to which complaint may be made, inquiry may go, and decision rendered, is disclosed by the first part of section 18, and a portion of section 20, which reads as follows:

"Sec. 18. Whenever any person, upon his own behalf, or class of persons similarly situated, or any firm, corporation, or association, or any mercantile, agricultural, or manufacturing society, or any body politic or municipal organization, shall make complaint to said board of railroad commissioners that the rate charged or published by any railroad company, or the maximum rates fixed by said commissioners in the schedule of rates made by them under the provisions of section 17 of this act, or the maximum rate that now or hereafter may be fixed by law is unreasonably high or discriminating, it shall be the duty of said commissioners to immediately investigate the matter of such complaint."

"Sec. 20. * * * Such decision shall specifically set out the sums or rate which the railroad company or common carrier so complained of may thereafter charge or receive for the service therein named, and including a classification of such freight; and the said commissioners shall not be limited in their said decision and the schedule to be contained therein to the specific case or cases complained of, but it shall be extended to all such rates between points in this state and whatever part of the line of railway of such company or common carrier within this state as may have been fairly within the scope of such investigation."

Now, the breadth of the inquiry is obvious from the matter of which complaint may be made. It is not simply of a rate charged or published by any railroad company, which of course presupposes some action on the part of the company, but it may also be of the maximum rates fixed by the commissioners in their schedule made under section 17; not necessarily a single rate for a single class of shipments, but generally of their maximum rates. In other words, the complaint may be narrowly of a single matter, or broadly of the rates fixed by the com-

missioners. Obviously, reading sections 17 and 18 together, the thought of the legislature was this: That under section 17 the commissioners should proceed in a legislative or administrative capacity, and, after giving notice generally, and not to any particular railroad company, and giving general opportunity to all for furnishing information, were to prepare schedules for all the roads, and then in order that the rates might be reduced to the lowest reasonable figure, it provided for complaint in section 16 against any particular road, and authorized the commissioners, after notice and hearing, to fix a schedule for that road, or determine the reasonableness of any particular charge. Only by giving this construction does it seem that full force can be given to all the words in section 18. The complaint generally of the railroad companies is that this statute is unnecessary, severe, and stringent. Obviously it was the thought of the legislature to provide for all contingencies, and to give the fullest power to the commissioners. Nor do I think that this construction renders the statute obnoxious to the charge of class legislation. Power of classification unquestionably exists; that is conceded. Power to determine upon complaint whether any charge or series of charges by a particular railroad company is reasonable or not cannot be questioned; and power to declare that that determination shall, as to the particular road, be a rule for the future, would seem to follow.

This brings us to the last of the three questions suggested, to-wit, the reasonableness of the rates. In respect to this I have nothing to add to what I have said in the opinion heretofore filed concerning the rules controlling judicial action. I abide by the propositions there laid down, and have simply sought to apply those rules to the facts developed by the testimony now presented. Neither shall I attempt any review of such testimony; its volume precludes this. All that I can do is to state conclusions and results, with two or three principal matters controlling the same. It may be premised that the testimony now presented is more definite and satisfactory than that before me in the summer. While much of it is by affidavit, still there has been since then time for examination and comparison, and the testimony is more positive and direct, and less a matter of estimate. I do not mean to say that everything has been made clear, but the testimony taken upon the different hearings, and the examinations made by the railroad officials, are more and more bringing out the exact facts. I notice first the testimony of Mr. Ripley, the general manager of complainant. His long experience and position with the company complainant give weight to this testimony. It shows the gross earnings of 1888 of complainant's entire road (the last two months estimated) will be $24,055,241.19, while the operating expenses and fixed charges will be $24,826,801.40, leaving a deficit of $771,560.21. If the same percentage of reduction adopted by the Iowa commissioners in their last schedule be applied to the whole business of complainant it would reduce their gross freight earnings $4,360,-000. Adding this to the actual deficit, there would be $5,131,560.21 of income less than the operating expenses and fixed charges. Now, if this were an average year,—a fair standard upon which to base our judg-

ments,—obviously the proposed reduction by even the last schedule prepared by the commissioners could not be sustained. But it is not a fair standard; the year has not been an average one. The testimony shows, even if the public history of the times did not compel the court to take judicial notice, that a wide-spread strike on the part of the engineers of complainant's road, continuing through many months, has added largely to the expenses of operating, and struck a heavy blow 'at the business of the company. Turning back to the year 1887, it appears from the same testimony that the operating expenses and fixed charges were $21,383,997.60, and that the gross earnings subjected to the commissioners' last schedule would have amounted to $21,656,583.04, leaving a balance of net earnings of $272,585.44, which would make a dividend of 35-100 of one per cent. on the capital stock. Mr. Ripley says that this was a prosperous year for the complainant. While that may be true, yet, looking back on the reports for prior years, it does not appear to have been an exceptionally prosperous year. While the tonnage of freight carried exceeded largely that in prior years, yet the gross freight earnings were less than that of three of the prior years. Indeed, looking back through the reports as far as 1870, it would seem that the company received less per ton for carrying freight during 1887 than in any prior year. If that be true, and the reduction made by the last schedule of the defendants applied generally to all the freight business of the company would still leave a balance, although a small one, for distribution among the stockholders, how, within the rules laid down in the prior opinion, can I hold that the rates are so unreasonable as to justify judicial interference? The testimony furnished by the officials of other roads as to the effect of the Iowa tariff on their earnings runs in the same direction. It is unnecessary to give figures. Again, these figures have been given upon the basis of a proportional reduction of all the freight tariffs of the complainant, both state and interstate. Nowhere is it affirmed by the witnesses for the complainant that, if the rates prescribed by this last Iowa tariff were applied to their whole business, the results above disclosed would follow. On the contrary, it is evident from the testimony that, if these Iowa rates were of universal application to the entire business of the company, there would not only be no deficit, but a considerable sum for distribution as dividends. If that be true, can these rates be declared unreasonable? This opens the door to a serious inquiry. Prior to this act terminal tariffs were in existence in Iowa, as they still are in other states. This act abolished within the limits of Iowa terminal tariffs, and substituted therefor uniform mileage tariff. Now, when in some states through which the company's road runs—a statute law imposing no restraints—the laws of competition compel terminal tariffs with their lower rates, can such submission to the laws of competition and business in one state be pleaded as an excuse for resisting the enforcement of low mileage tariff in this state? I think the answer to that question will be found in the opinion heretofore filed. *Railway Co.* v. *Dey,* 35 Fed. Rep. 866. Neither necessity of business, real or seeming, in one state, nor the laws of that state, fur-

nish any excuse for reducing the local tariff beneath that which is compensatory. The real question is not 'what effect upon the earnings of complainant a similar percentage of reduction in all its tariffs would occasion, but what would be the effect if the Iowa schedule was applied to all its business. The answer to this question seems, from the testimony, to be that the rates would be compensatory. I remark again that the amount of purely local freight, as compared with the other business of the company, is very small,—four per cent., I believe,—so that, if the entire earnings from this part of its business were swept away, the loss of the company would be limited in amount. Of course this fact does not authorize injustice, or sanction rates which are unreasonable; but it suggests the propriety, in view of the considerations heretofore noticed, of actual experiment as the most satisfactory test of the reasonableness of rates. I quote in this respect the language of Mr. Chief Justice WOODS in the case of *Tilley* v. *Railroad Co.*, 5 Fed. Rep. 662:

"The officers of the railroad company declare that the rates fixed by the commission will so reduce its income that it will not suffice to pay the running expenses of the road and the interest on its bonded debt, leaving nothing for dividends to its stockholders. The railroad commissioners assert that their schedule was framed to produce eight per cent. income on the value of the road after paying cost of maintenance and running expenses. Which view is the correct one it is impossible to decide from the evidence submitted. There is, however, a conclusive way,—and it seems to me it is the only one, —by which this controversy can be settled, and that is by experiment. A reduction of railroad charges is not always followed by a reduction of either gross or net income. It can soon be settled which is right—the railroad company's officers or the railroad commission—in their view of the effect of the commission's tariff of rates by allowing the tariff to go into operation."

While quoting this language as applicable hereto, I do not mean to indorse it as of universal application, but only under the circumstances of the present case. Where the effect of the rates is doubtful, with a probability that they will prove compensatory, and the amount of business to be affected thereby is comparatively small, I think the courts may well wait for the test of experience. Influenced by these considerations, I am led to refuse the preliminary injunction, and to set aside the restraining order heretofore entered. It may well be that by the time this case comes to a final hearing the test of experience will have solved some of these matters, and it may be clear—as now seems probable— that the rates imposed by this last schedule are compensatory within the rule laid down in the prior opinion, in which case no injunction ought to issue, or clear that they are not compensatory, in which case, beyond any doubt in my mind, a final and permanent injunction ought to be granted. The preliminary injunction will be refused, and the restraining order will be set aside. The same order will be made in the similar case of the *Chicago, M. & St. P. R. Co.* v. *Same Defendants.*