The Pennsylvania Railroad Company as lessee, operates as a part of its system, the line known as the Northern Central *Page 62 
Railway. The Baltimore division of this extends from Baltimore to Harrisburg, Pennsylvania, lying thus in two States. Through traffic over this is accordingly interstate traffic. In addition to this through business, there is also local business, which between Baltimore and Parkton is wholly in the State of Maryland, and this business being intrastate is subject to State control, in so far as it is subject to any control at all in the interest of the public. For some time past there has been a demand on the part of the railroads of this country for an increase of their revenues, on the ground that as the result of a number of contributing causes they were either making no net revenue at all or at best one inadequate to meet the requirements for the upkeep of their roadbed and rolling stock, or extensions rendered desirable by the increase of population or development of new localities, and also yield any adequate return on the capital employed in the enterprise. Among the causes contributing to this condition were the hostile legislation in many States, placing new and additional burdens on such companies, the great increase in wages paid to employees, and the enhanced cost of requisite supplies of all kinds.
As a means to in part overcome the unfavorable condition, there has been throughout the eastern States at least, an increase in the rates for passenger transportation. Such travel may be roughly divided into four general classes, though this will not include all varieties of the passenger transportation, each one of which has its own distinctive characteristics, which clearly differentiate it from the others. These classes are single rate fares, mileage rates, commutation rates and party rates. It is with the third of these, commutation rates, that this case has to deal.
For a number of years there had been in force on the Northern Central Railway commutation rates from Baltimore to points on the line of the railway as far as Parkton. On November 25th, 1914, the railway company filed with the Public Service Commission of this State a proposed tariff of new passenger rates for such commutation service involving *Page 63 
an entire revision and increase of the rates over those theretofore charged for such service. This was followed by a "petition and complaint" by a number of those to be affected by the changes, and the question thus came before the Public Service Commission, which heard testimony on behalf both of the petitioners and the railroad, and by its order of December 21st, 1914, granted certain increases, though in no instance to the full extent asked by the railroad company. Then the bill in this case was filed to enjoin the commission from enforcing or attempting to enforce the order of December 21st. It is from the decree dismissing the bill of the railroad company that this appeal is taken.
The question is not now presented whether it is within the power of the Public Service Commission to require the establishment of a schedule of commutation rates by a railway company in a case where no such rates had theretofore existed. Upon that no opinion is now expressed. What the Court is now called to pass upon is the reasonableness of commutation rates, where such a system of rates has long been in operation by the action of the company, and where a modification of those rates was proposed by the railway company and by it submitted to the Commission. Whether commutation rates shall be established at all is a question of policy upon the part of the company, but if such a policy is adopted there will still remain the reasonableness of the manner in which that policy is carried out.
What was endeavored to be done by the railroad with regard to rates, and how far the same was gratified by the order of the Commission will be best understood from the following table: *Page 64 
 Rates as per Schedule Rates under Order
 Rates Prior to filed Nov. P.S. Com., Dec.
 Nov. 25, 1914. 25, 1914. 23, 1914.
1: Round trip, 10 Round trip, no limit, Round trip, 2 1/4c
 day, 2 1/4c. per 2 1/2c. per M. per M.
 M.
2: Exc. 2 — 10 Discontinued. No ruling made.
 days, 2 1/4c. per
 M.
3: 10-strip ticket, 10 trip, 3 mos., 10 strip, 3 mos., 2c.
 1 yr., 1 8/10c. 2 1/4c. per M. per M.
 per M.
4: 60-trip 1 mo., 60 trip 1 mo., former 60 trip 1 mo., former
 2c. for first 3 rate plus rate plus
 M., 1/4c. for ea. 25c. flat. 25c.
 addl. 1/2 Mont.
5: 100-trip 1 yr. Discontinued. 100 trip 4 mos., former
 at double 60 rate, plus
 trip. $1.
6: 180-trip 3 mos. 180 trip 3 mos. at 180 trip 3 mos.,
 same as 4, less 3 times 60 trip. former rate, plus
 10%. 75c.
7: 46-trip School, 46 trip School 1 46 trip School, 1
 1 mo., 46/60 mo., 46/60 of 60 mo., 46/60 of 60
 of 60-trip. trip. trip.

At or about the same time the railroad company made increases in the single rate fares, and also in the mileage ticket, but as both of these forms of transportation involved under the circumstances of this case, interstate rather than intrastate carriage, the jurisdiction over them belonged to a different *Page 65 
tribunal, and did not and cannot properly enter into the consideration of this case at all.
The first prayer of the bill is that the action of the Public Service Commission may be declared void and set aside. When couched in so general terms the ground for such a prayer is not clearly evident. A body like the Public Service Commission has of course no power or authority to make any order, except in so far as the authority is distinctly conferred upon it by the Legislature. But the Act creating the Public Service Commission, now codified as sec. 413, etc., of Article 23, when taken in connection with the Amendatory Act, Chapter 162 of the Acts of 1912, clearly confers upon the Commission full power, so far as it was within the province of the Legislature to grant it, to supervise and regulate all tariffs and transportation charges within the State, including by its very terms, commutation rates. Or the contention of the plaintiff may have been in this regard upon a somewhat different theory, namely, that while it might be within the power of the Legislature and therefore, by delegation, within the power of the Public Service Commission, to regulate and establish the single rate fare, yet when it had done so, it had exhausted its power and could not thereafter make any regulation whatever to affect either mileage or commutation rates, and for this claim there is warrant to be found in the language used in the decision of the Lake Shore Mich. So. Ry. v. Smith, 173 U.S. 684, in which MR. JUSTICE PECKHAM elaborately discusses the question of the validity of an Act of the Michigan Legislature, which was intended to regulate the price of 1,000-mile tickets, and holds that in attempting so to do the Michigan Legislature had exceeded its powers. Without citing his argument in full, the following language to be found in the opinion will indicate its trend: "If unhampered by contract, there is no doubt of the power of the State to provide by legislation for maximum rates of charges for railroad companies, subject to the condition that they must be such *Page 66 
as will admit of the carrier earning a compensation that under all the circumstances shall be just to it and to the public, and whether they are or not, is a judicial question. If the rates are fixed at an insufficient amount within the meaning of that term as given by the courts, the law would be invalid, as amounting to the taking of the property of the company without due process of law. * * * The question is presented in this case whether the Legislature of a State has also the right after having fixed a maximum rate for the transportation of passengers to still further regulate their affairs and to discriminate and make an exception in favor of certain persons and give them a right of transportation for a less sum than the general rate provided by law. * * * The Act is not a general law upon the subject of rates establishing maximum rates which the company can in no case violate. The Legislature having established such maximum as a general law, now assumes to interfere with the management of the company while conducting its affairs pursuant to and obeying the statute regulating rates and charges, and notwithstanding such rate, it assumes to provide for a discrimination, an exception in favor of those who may desire and are able to purchase tickets at what might be called wholesale rates — a discrimination which operates in favor of the wholesale buyer, leaving the others subject to the general rule. It thus invades the general right of a company to conduct and manage its own affairs, and compels it to give the use of its property for less than the general rate to those who come within the provisions of the statute, and to that extent it would seem that the statute takes the property of the company without due process of law. We speak of the general right of the company to conduct and manage its own affairs, but at the same time it is to be understood that the company is subject to the unquestioned jurisdiction of the Legislature in the exercise of its power to provide for the safety, the health and the convenience of the public, and to prevent improper exactions or extortionate *Page 67 
charges from being made by the company. * * * The power of the Legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community and to carry the members of that class at a less sum than it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation."
The Act was further criticised for the reason that it compelled the company to carry not only those who might purchase the mileage tickets, but also the length of time during which the company should be obliged to honor them, the forfeiture of the ticket under certain conditions and the redemption of any unused portion of it at the expiration of two years. This Act applied in a case with regard to a mileage ticket, and in regard to the same class of ticket the decision above quoted was followed and adopted in Beardsley v. N.Y., L.E. W.R.R., 162 N.Y. 230;North Dakota v. The Great Northern Ry., 17 No. Da. 370;State v. Bonneval, 128 La. 902; Virginia v. Atl. CoastLine, 106 Va. 61; Chi., R.I. P. v. Ketchum, 212 Fed. 986.
It was contended in argument on behalf of the Public Service Commission that, while not in terms overruled, the effect of the decision in the Lake Shore case, supra, had been very much weakened, if not entirely done away with, by other and later decisions. Since the argument of this case, however, the Supreme Court of the United States has rendered opinions in three cases, which clearly show that in the view of that Court the decision in the Lake Shore case is still in full force. The first two of the cases referred to are the Northern Pac. Ry. Co. v. No.Dakota, and the Minneapolis, S.P. S. Ry. Co. v. No.Dakota, 236 U.S. 585; the proceedings in each of these cases were instituted by the Atty.-Gen'l. of the State, for a mandatory injunction against the railroads to require them to put into effect an Act of the Legislature of North Dakota, establishing a maximum coal rate *Page 68 
in that State. In the case of the Northern Pac. Ry. Co. it was shown that out of a total revenue derived from the carriage of coal of $58,953.07, there was a surplus income over and above expenses of $827.61, and that in the case of the other road the carriage was conducted at an actual loss. In the course of that opinion, MR. JUSTICE HUGHES uses the following language:
"The general principles to be applied are not open to controversy. The railroad property is private property devoted to a public use. As a corporation, the owner is subject to the obligations of its charter. As the holder of special franchises, it is subject to the conditions upon which they were granted. Aside from specific requirements of this sort, the common carrier must discharge the obligations which inhere in the nature of its business. It must supply facilities that are reasonably adequate; it must carry upon reasonable terms, and it must serve without unjust discrimination. These duties are properly called public duties, and the State within the limits of its jurisdiction may enforce them. The State may prescribe rules to insure fair remuneration and to prevent extortion, to secure substantial equality of treatment in like cases, and to promote safety, good order and convenience. * * *
"But, broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it can not be compelled to carry freight. As a carrier for hire, it can not be required to carry persons or goods gratuitously. The case would not be altered by the assertion that the public interest demanded such carriage. The public interest *Page 69 
can not be invoked as a justification for demands which pass the limits of reasonable protection and seek to impose upon the carrier and its property burdens that are not incident to its engagement. In such a case, it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain. * * *
"We have, then, to apply these familiar principles to a case where the State has attempted to fix a rate for the transportation of a commodity under which, taking the results of the business to which the rate is applied, the carrier is compelled to transport the commodity for less than cost or without substantial compensation in addition to cost. We say this, for we entertain no doubt that in determining the cost of the transportation of a particular commodity, all the outlays which pertain to it must be considered. We find no basis for distinguishing in this respect between so-called `out-of-pocket costs,' or `actual' expenses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. Illustrations are found in outlays for maintenance of way and structures, general expenses and taxes. It is not a sufficient reason for excluding such, or other, expenses to say that they would still have been incurred had the particular commodity not been transported. That commodity has been transported; the common carrier is under a duty to carry, and the expenses of its business at a particular time are attributable to what it does carry. The State can not estimate the cost of carrying coal by throwing the expense incident to the maintenance of the roadbed, and the general expenses, upon the carriage of wheat; or the cost of carrying wheat by throwing the burden of the upkeep of the property upon coal and other commodities. This, of course, does not mean that all commodities are to be treated as carried at the same rate of expense. The outlays that exclusively pertain to a given class of traffic *Page 70 
must be assigned to that class, and the other expenses must be fairly apportioned. It may be difficult to make such an apportionment, but when conclusions are based on cost the entire cost must be taken into account. * * * But, while local interests serve as a motive for enforcing reasonable rates, it would be a very different matter to say that the State may compel the carrier to maintain a rate upon a particular commodity that is less than reasonable, or — as might equally well be asserted — to carry gratuitously, in order to build up a local enterprise. That would be to go outside the carrier's undertaking, and outside the field of reasonable supervision of the conduct of its business, and would be equivalent to an appropriation of the property to public uses upon terms to which the carrier had in no way agreed. It does not aid the argument to urge that the State may permit the carrier to make good its loss by charges for other transportation. If other rates are exorbitant, they may be reduced. Certainly, it could not be said that the carrier may be required to charge excessive rates to some in order that others might be served at a rate unreasonably low. * * *
"But a different question arises when the State has segregated a commodity, or a class of traffic, and has attempted to compel the carrier to transport it at a loss or without substantial compensation even though the entire traffic to which the rate is applied is taken into account. On that fact being satisfactorily established, the presumption of reasonableness is rebutted. * * *
"In Interstate Commerce Commission v. Union Pacific R.R.Co., 222 U.S. 541, 549, in speaking of the carriers' concession that they were unable to determine the cost of the particular traffic in question and that a former rate had not been `less than cost,' the Court said: `Whether the carrier earned dividends or not sheds little light on the question as to whether the rate on a particular article is reasonable. For, if the carrier's total income enables it to declare a dividend, *Page 71 
that would not justify an order requiring it to haul one class of goods for nothing, or for less than a reasonable rate. On the other hand, if the carrier earned no dividend, it would not have warranted an order fixing an unreasonably high rate on such article.' * * *
"To repeat and conclude: It is presumed, — but the presumption is a rebuttable one — that the rates which the State fixes for intrastate traffic are reasonable and just. When the question is as to the profitableness of the intrastate business as a whole under a general scheme of rates, the carrier must satisfactorily prove the fair value of the property employed in its intrastate business and show that it has been denied a fair return upon that value. With respect to particular rates, it is recognized that there is a wide field of legislative discretion, permitting variety and classification, and hence the mere details of what appears to be a reasonable scheme of rates, or a tariff or schedule affording substantial compensation, are not subject to judicial review. But this legislative power cannot be regarded as being without limit. The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes, outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated and a rate imposed which would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its service after taking into account the entire traffic, to which the rates applies, it must be concluded that the State has exceeded its authority."
The third case of those recently decided by the Supreme Court was the case of the Norfolk West Ry. Co. v. Conley,236 U.S. 605; in which the Court had under consideration an Act of the Legislature, of West Virginia, establishing a maximum rate for passengers on railroads at two cents a mile and in that case after reference to the two cases last cited, the Court says: *Page 72 
"The fundamental question presented is, whether the validity of the passenger rate can be determined by its effect upon the passenger business of the company separately considered. It is not necessary that there should be uniform rates or the same percentage of profits on every sort of business; and that there is abundant room for reasonable classification and the adaptation of rates to various groups of services. It was further held that despite this range of permissible action, the State has no arbitrary power over rates; that the devotion of the property of the carrier to public use is qualified by the condition of the carrier's undertaking that its services are to be performed for reasonable reward; and that the State may not select a commodity, or class of traffic, and instead of fixing what may be deemed to be reasonable compensation for its carriage, compel the carrier to transport it either at less than cost or for a compensation that is merely nominal.
"These considerations are controlling here. The passenger traffic is one of the main departments of the company's business; it has its separate equipment, its separate organization and management, and of necessity its own rates. In making a reasonable adjustment of the carrier's charges, the State is under no obligation to secure the same rate of return from each of the two principal departments of business, passenger and freight; but the State may not select either of these departments for arbitrary control. Thus, it would not be contended that the State might require passengers to be carried for nothing, or that it could justify such action by placing upon the shippers of goods the burden of excessive charges in order to supply an adequate return for the carrier's entire service. And, on the same principle, it would also appear to be outside the field of reasonable adjustment that the State should demand the carriage of passengers at a rate so low that it would not defray the cost of their transportation, when the entire traffic under the rate was considered, or would provide only a nominal reward in addition to cost."
From these citations it will be apparent that the limitations placed upon legislative action do not go to the extent *Page 73 
of saying that the establisment by State authority of a maximum single rate exhausts the power of State regulation, or that there may not be different rates for different characters of service. In the interest of the public there subsists and must subsist in the State the power to control and prevent exorbitant or extortionate charges for services performed. While at the same time that regulation must be reasonable in its character and so framed as under ordinary or normal conditions to bring about a proper return to the railroad for the service performed independent of the return to the railroad from other and a different character of service.
The contention was made upon the part of the Public Service Commission that in determining the reasonableness of the charge the entire net revenue of a railroad must be looked to, from whatever source derived, whether passenger, freight, express or investments held by the company, and there are undoubtedly cases which tend to support that view, among which may be named Ry.Co. v. Smith, 60 Ark. 221; P. A.R.R. v. Fla., 25 Fla. 310;The People v. St. L.A.T. H.R.R., 176, Ill. 512. These cases, however, are not in accord with the general trend of decision. In L. N.R.R. v. R.R. Comms., 208 Fed. 35, certain passenger rates were complained of, and the evidence tended to show that the operation of the road as a whole was unprofitable, mainly because it was transporting iron and coal at or below cost and it was there held, that the intrastate passenger rate could not be attacked because the entire business of the road did not yield a fair return. In the Railroad Comms. v. The Ill. Cent.R.R., 20 I.C.C. 181, the question arose with regard to certain tolls of the Dunleith Dubusque Bridge Company, of twenty-five cents per passenger, for local traffic, when the same charge was not made on through tickets, and it was there said that the fact that the net earnings of the carrier may be large does not of itself justify us in fixing a rate at less than is reasonable for the service, all other things being considered. In TheCommutation Rate Cases, 21 I.C.C. 428, *Page 74 
the Interstate Com. Com. had under consideration the commutation rates of eight railroad companies, running into New York, most of them from points in New Jersey. In the opinion which was filed, Commissioner Harlan said:
"In our judgment, the carriage of a commuter differs in many respects from other passenger traffic and is an independent, special service."
He reviews at length the history of commutation transportation, and shows wherein it differs from transportation by mileage tickets or other forms of carriage, and there holds that for commutation service the carrier is entitled to receive a reasonable compensation, and no more. In that case he found that the commutation rates charged by the New Jersey Central were fair and reasonable, while those charged by the Pennsylvania were not, and accordingly required a reduction in the commutation rates of the latter road; but in so doing no account was taken of the passenger returns from the entire Pennsylvania system, nor of the net revenue derived from the combined receipts of freight, passenger and express business. So in the Minnesota rate cases,230 U.S. 352, it was held that where a carrier does both interstate and intrastate business, in order to determine whether a scheme of maximum intrastate rates afforded a fair return for the value of the property employed in intrastate business, the rates prescribed must be considered separately, and that the profits and losses on interstate business can not be offset. And the same principle underlay the decision in the Interstate Com.Comm. v. The N.P. Ry., 222 U.S. 541, and the Int. Com. Comm. v. L. N.R.R., 227 U.S. 88. The same question was before this Court in the case of the Public Service Commission v. N.C. Ry.Co., 122 Md. 355, and on page 390, JUDGE THOMAS, speaking for this Court, said: "We can not adopt the view that common carriers may be required to perform services at rates less than the actual cost of such services, for that would amount to confiscation, and would ultimately defeat the very end they *Page 75 
are designed to accomplish, namely, to subserve the public good and public convenience."
One of the grounds upon which the Court was asked to enjoin the enforcement of the order of the Public Service Commission was that it was discriminatory. But it is not all discriminations which are condemned by the law. As illustrating the distinction, it is sufficient to cite the case of Iowa V.O. v. C., B. Ry.Co., 113 Iowa 30, in which an ordinance of the City of Council Bluffs was held void for this reason, and the case of theInterstate Com. Comm. v. B. O.R.R., 145 U.S. 263, commonly known as the Party Rate case, in which a not dissimilar discrimination to that now presented was involved, and yet was held to be a valid act.
When we turn to the testimony offered before the Public Service Commission to determine the reasonableness or unreasonableness of the rates as fixed by the order of the Commission, we encounter serious difficulties. It is conceded that the increase in the straight fare ticket will produce an increase of revenue to the railway, but of what amount or how far it may operate to diminish the present passenger operating ratio, there is no means of determining. As the accounts of the railway company have been kept, there has been an attempt to apportion the receipts and expenditures as between freight and passenger business, both over the entire Northern Central system, and also over the Baltimore Division. But that is as far apparently as the effort at apportionment has gone. In this, 65% of the expenditures has been apparently readily apportioned as between the freight and passenger business, while the remaining 35% has been allocated arbitrarily. In this is included much in the way of expense which pertains to both of these classes of business, such as maintenance of way, bridges, and the like, but, taking the apportionment as made to have been measurably fair, there is this further difficulty remaining — no attempt has been made to subdivide the receipts upon the *Page 76 
passenger business of the Baltimore Division, as between the portion which lies within the State of Maryland, and the territory between Parkton and Harrisburg, still less to furnish anything like exact figures of the relative receipts and expenses arising from commutation business. Numerous and elaborate tabulations were offered on behalf of the company, tending to show that the passenger business of the Baltimore Division had been operated at an actual loss for a number of years. Without going into these in detail, the subjoined extract from Plaintiff's Exhibit No. 5 will show the claim of the railway in this regard:
 Ratio of Expenses
 Passenger. to Revenues.
 Revenues. Expenses
 (Inc. Taxes). Passenger.
1908 ....... $ 931,858 $ 985,001 105.70
1909 ....... 1,012,340 1,045,904 103.32
1910 ....... 1,089,574 1,319,213 121.08
1911 ....... 1,096,251 1,363,141 124.35
1912 ....... 1,160,982 1,244,285 107.18
1913 ....... 1,265,595 1,387,306 109.62

But in this connection it must be borne in mind that the figures in the expense column and in the column of ratio of expenses to revenue might be materially modified by a slightly different apportionment of the 35% which, as already stated, was necessarily arbitrarily allocated, and might be still further modified if we had absolute figures in regard to that portion of the passenger business of the Baltimore Division conducted over the part of that division lying between Baltimore and Parkton.
From what has already been said the rates charged to the general public must be reasonable, not, however, to the point of being confiscatory. But "the point of injustice is reached long before that of confiscation, and to make the word `confiscatory' really appropriate it must be read not in the sense of producing actual confiscation, but of having an inevitable *Page 77 
tendency thereto." Pa. R.R. v. Phila. Co., 220 Pa. 100. "Public service corporations are entitled to look to a rate of return, if their property will earn it, not less than the legal rate of interest, and a system of charges that yields no more income than is fairly requisite to maintain the plant, pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts, and pay a fair profit to the owners of the property, can not be said to be unreasonable. * * * While the public has certain rights which in case of conflict must prevail, yet it must not be forgotten that even so-called public service corporations are private property, organized and conducted for private, corporate profit. And unless necessary for the fulfillment of their corporate duties they should not be required to do any part of their business in an unbusiness-like way, with a resulting loss. If part is unprofitable, it is neither good business nor justice to make it more so because the loss can be offest by profit on the rest." Ibid.
This plainly follows for the reason stated in B. M.R.R. v.State, 93 Atl. Rep. 306, 310, where it is said: "Although the plaintiffs are common carriers, engaged in a public service, they are entitled to compensation for the service performed. Authority for requiring them to render service for less than fair compensation, if it exists, must be found in some preceding stipulation of the parties. It must be rested in contract, not upon the police power of the State."
Though less explicit, to the same effect will be found the decision in St. L. S.F. Ry. v. Gill, 156 U.S. 649.
The general principles applicable to a case of this character have already been stated, and the conclusion to be drawn from the evidence as to what is and what is not proved with regard to the confiscatory effect of the tariffs as embodied in the order of the Public Service Commission. The next step is as to the force and effect which should be given to the findings of the Commission, as contained in the order of December 21st, 1914. Analogy is sought to be drawn from the provision in the Interstate Commerce Act, which *Page 78 
provides that the findings of that commission are prima facie
correct, and this has been recognized in a number of cases. C.,H. D. Ry. v. Int. Com. Comm., 206 U.S. 142; Ill. Cen. Ry.Co. v. Int. Com. Comm., 206 U.S. 441.
While this provision of the Interstate Commerce Act has no exact counterpart in the Public Service Commission Act of this State, the function of the courts, when called on to review an order of the Public Service Commission, was clearly and aptly stated by JUDGE THOMAS, in Pub. Serv. Comm. v. N.C. Ry. Co.,122 Md. 388, where he said:
"Upon an application to the Court for an injunction restraining the execution of an order of the commission, the Court has no authority to determine what would be a reasonable rate for the service required, or to establish rates, but its power is limited to the determination of the question whether the rates fixed by the commission are unreasonable or unlawful, and until it is made to appear by clear and satisfactory evidence that the action of the commission is unreasonable or unlawful, the Court is without power to impose any restrictions upon the execution of the commission's order."
And the same view has been adopted in Wisconsin in M., St. P. S.S. Ry. v. R.R. Com., 136 Wis. 146, and it is there stated that the function of the Court "is not to determine whether a rate or service fixed by it is reasonable and just, but to determine whether the order is unreasonable or unlawful. If the order be found by the Court to be such that reasonable men might well differ as to its correctness, it can not be said to be unreasonable."
The whole duty, power and function of the Court in such cases was well summed up by CHIEF JUSTICE WHITE in Ill. Cent. R.R. v.Int. Com. Comm., 215 U.S. 470, when he said:
"Beyond controversy, in determining whether an order of the commission shall be suspended or set aside, we must consider, (a) all relevant questions of constitutional power or right; (b) all pertinent questions as to whether the administrative *Page 79 
order is within the scope of the delegated authority under which it purports to have been made, and (c) a proposition which we state independently, although in its essence it may be contained in the previous one, viz, whether although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable a manner as to cause it in truth to be within the elementary rule, that the substance and not the shadow determines the validity of the exercise of the power. Plain as it is that the powers just stated are of the essence of judicial authority, and which, therefore, may not be curtailed and whose discharge may not be by us in a proper case avoided, it is equally plain that such perennial powers lend no support whatever to the proposition that we may, under the guise of exerting judicial power, usurp merely administrative functions, by setting aside a lawful administrative order upon our conception as to whether the administrative power has been wisely exercised."
As already pointed out the increase in the passenger tariff, including straight fares and the return from commutation and mileage tickets is an uncertain quantity. It is perfectly evident that in the estimation of the railroad accounting officials an increase of revenue was expected to be derived under the tariff as proposed by them on November 25th, and if this estimate is correct, it necessarily follows that the revenue to be derived under the tariffs established by the order of the Public Service Commission of December 21st, must also bring an increase in revenue over that previously received. With the increase in straight fares the Public Service Commission has not attempted to deal, yet some portion of this when received, is properly to be apportioned to the receipts of the Baltimore division and the effect will necessarily be to produce an increase in revenue derived from passenger traffic beyond that received for the last five years, other conditions remaining normal. The same is true with regard to commutation rates. It may turn out as the result *Page 80 
of the revision of these tariffs that there will be more monthly tickets sold and fewer of the one hundred trip tickets, but all of this is to a very considerable degree a matter of conjecture merely. The true test of the effect upon the revenue of the changes made must and can only be the test of time and practical experience. The bill in the present case was filed almost immediately upon the passage of the order by the Public Service Commission, and we are of opinion that before that order is disturbed by the Court it should be given the test of a practical trial. The most that the evidence gives us is the opinion of certain railway experts, and yet their evidence shows that they are far from having such complete data as to enable them to give anything more than an opinion. As was said by WOODS, JUSTICE, inTilley v. Railroad Co., 5 Fed. 641, 662, in a case where the evidence had been conflicting or uncertain as to the probable remunerative effect of a new tariff, "which view is the correct one it is impossible to decide. There is, however, a conclusive way and one only in which this controversy can be settled and that is by experiment. A reduction in railroad charges is not always followed by a reduction of either gross or net income. It can soon be settled which is right, the railroad company's officers or the railroad commission, in their view of the effect of the Commission's tariff of rates by allowing the tariff to go into operation."
This view was cited with approval and adopted in the case ofC., B. Q.R.R. v. Dey, 38 Fed. 656, and again by the Supreme Court of Florida, in P A.R.R. v. Florida, 25 Fla. 310; again in the case of Knoxville v. Knoxville Water Co.,212 U.S. 1; MR. JUSTICE MOODY concludes the opinion as follows: "The Courts in clear cases ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. If hereafter it shall appear under the actual operation of this ordinance (an ordinance fixing maximum water rates for the City of Knoxville) that the return allowed by it operates as a confiscation of property nothing in this judgment will prevent *Page 81 
another application to the Court, but as the case now stands there is no such certainty that the rates will necessarily have the effect of denying to the company such a return as would avoid confiscation." And in the case of Wilcox v. The Con. GasCompany, 212 U.S. 19, MR. JUSTICE PECKHAM, uses this language: "Where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, a Court of Equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating as far as is possible the doubt arising from opinions as opposed to facts."
In the case in which this opinion was rendered just as in the case now under consideration, the Court was asked to intervene before there had been any actual experience of the practical result of the rates established.
So in the present case the test of experience will soon make it clear whether the rate imposed by the order of the Public Service Commission can in any proper sense be termed confiscatory or compensatory; if the latter, no injunction ought to issue, while if not compensatory, beyond any doubt an injunction should be granted.
It was suggested in the argument that the effect of putting into operation the tariff established by the Commission would be to require a lowering of interstate tariffs as well; but this by no means follows, because the two services are radically different, and the one is by no means a conclusive measure for the other, and among the points decided by the Minnesota RateCases, 230 U.S. 352, were the following: 1st. That Congress has not by the creation of the Interstate Commerce Commission sought to establish a unified control over interstate and intrastate rates; 2nd, that the fixing of reasonable rates for intrastate transportation was left with the States, and the agencies created by the States to deal with; and 3rd, that the inter-blending of operations in the conduct of interstate and local business, and the exigencies that are said to arise with respect to the maintenance of interstate rates by *Page 82 
reason of their relation to intrastate rates are considerations for the practical judgment of Congress. And in connection with this last point, it is to be observed that up to the present time Congress has not undertaken or seen fit to attempt to regulate or interfere with the establishment, maintenance or exercise of supervision over intrastate rates.
It was perhaps unfortunate that the Public Service Commission in its order used the following language: "That its said order of December 21st, 1914, shall continue in force for a period of ten years unless earlier modified or abrogated by the said commission." It certainly will not require ten years' time of practical experience under the tariff adopted by the commission to demonstrate whether the rates fixed are confiscatory or compensatory. And while it is true that the order expressly reserves the right to modify or abrogate the order of December 21st prior to the expiration of ten years, it would have been far better to have avoided even the impression of determining in advance the effect of a new scheme of rates for a definite period of time. Therefore, in affirming the decree of the Circuit Court, it will be with a reservation of the right of the railroad company, after the lapse of a reasonable time, to apply to the commission for a rescission or modification of its order, if experience shall demonstrate that the revenue derived under the tariff as established by the commission is not properly compensatory for the service performed.
Decree affirmed, with costs. *Page 83